(5 Misc. Rep. 560.)

### In re CHILDS' ESTATE.

(Surrogate's Court, Cattaraugus County. November, 1893.)

1. EXECUTORS AND ADMINISTRATORS—INVENTORY—EVIDENCE OF VALUE.
　　The inventory of an estate is prima facie evidence of the value as against the administrator.

2. SAME—FAILURE TO COLLECT MONEY.
　　An administrator who makes no active effort to collect money due to the estate is liable therefor.

3. SAME—CLAIM OF ADMINISTRATOR—VERIFICATION.
　　Though a personal claim of an administrator against the estate must be verified, the verification does not establish the claim, as the adminis-

trator is disqualified from testifying by Code Civil Proc. § 829, relating to transactions with decedents.

**4. SAME—PROOF OF CLAIM.**

A claimant produced witnesses that decedent had admitted the indebtedness asserted by the claim, and that the money was advanced for the support of decedent. It appeared that decedent was a man of property, and able to take care of himself, while claimant was entirely without means. There was also evidence that decedent had stated shortly before his death that he did not owe a cent in the world. *Held*, that such claim was not supported by the evidence.

**5. SAME—INTEREST ON FUNDS OF ESTATE.**

Where an administrator retains funds of the estate for six months without making any disposition thereof, he is chargeable with interest.

Judicial settlement of the account of Marvin A. Childs, as administrator of the estate of George Childs, deceased.

G. W. Cole, for petitioner.
D. A. Sackrider, for administrator.

DAVIE, S. Letters of administration upon the estate of the deceased were issued to Marvin A. Childs by the surrogate's court of Cattaraugus county on the 25th day of April, 1883, and, no proceedings having been taken by the administrator for a judicial settlement of his accounts, a petition was filed on the 9th day of March, 1893, pursuant to the provisions of section 2726 of the Code, by one of the next of kin, asking that the administrator be cited to show cause why he should not render an account of his proceedings; and the citation thereupon issued was personally served upon the administrator, but entirely ignored by him. An order was then made directing him to account, and in response thereto he appeared, and filed his petition for judicial settlement, and upon the return of the citation issued for that purpose presented his account, to various items of which objections are filed.

In the account filed the administrator charges himself with the amount of the inventory, viz. $518.59, and credits himself with having paid the burial expenses of the intestate and his wife (who was buried on the same day) to the amount of $200; with price of burial lot, $20; physician's bill, $30; bill for nursing deceased, $30; with $45 paid to the widow of George Childs, a deceased son of the intestate, to apply upon her distributive share; and with an alleged decrease of inventory from loss on furniture, $31.35; loss on Ward note, $104.56; loss on Squires mortgage, $103.13. The administrator also presents a personal claim against the estate for the sum of $400, which, if allowed, not only consumes the entire estate, but leaves a considerable balance due the administrator. It is conceded that the item of $31.35, loss on furniture, and item of $30 for physician's bill, are proper credits; nor does there seem to be any controversy in regard to the $45 paid to the widow of George Childs, deceased; and, while the evidence is not very satisfactory or convincing in relation to the $30 item for nursing, yet perhaps it is sufficient to justify the allowance of that claim to the administrator. No voucher is presented for this payment, but the evidence shows that the intestate and his wife were sick at the

same time, and died very nearly together, and that the attendance and services of a nurse were indispensable; and the administrator testifies that a nurse was employed, and that, according to his best recollection, he paid this bill; and thre is nothing in the evidence indicating anything to the contrary. The credit of $200 for funeral expenses is clearly erroneous, and greatly in excess of the amount paid for that purpose. Although the administrator includes this item in his account, and distinctly and positively verifies it, yet, when examined as a witness in relation thereto, he says:

"The deceased and his wife were both buried the same day. Stillman was the undertaker. The funeral expenses consisted ot two hearses and two caskets and undertaker's fees. I do not specifically recollect taking a voucher from Stillman."

The undertaker, Stillman, was called as a witness for the contestants, and his books of account are produced showing the items of the burial expenses, amounting in all to the sum of $56, and no more. There is no opportunity for speculation as to this item. The evidence is positive and uncontradicted, and it is difficult to discover from the evidence any adequate or reasonable excuse or apology on the part of the administrator for seeking to charge the estate with an item so greatly in excess of that actually paid. A similar state of facts is disclosed in regard to the item of $20 for burial lot. The administrator positively verifies the correctness of this charge in his account, yet on his examination he says:

"The deceased and his wife were buried at Bucktooth. The lot was a family lot. I have no deed of it. I did not get any deed of it. I do not claim that I ever paid one cent for this burial lot. I can't tell who I made the arrangement with for the lot. Don't know as I have any title to the lot."

Among the assets of the intestate, and included in the inventory, were two promissory notes, designated as the "Ward Notes," for $104.56 each. The account filed contains a credit to the administrator for the amount of one of these notes, accompanied by the explanation that "this note had been nearly all paid to my intestate in his lifetime." The administrator should not be charged with this note simply and solely from the fact that it was included in the inventory, yet the note being to all appearances a valid and subsisting demand in favor of the estate, the inventory is prima facie evidence of the value of this asset against the administrator. Redf. Sur. Pr. 696. The administrator testified in relation to this note:

"I found these notes among the assets. I think Richard McKay collected what was due, and sent the money to me. I don't think he sent me the full amount. I never went to see the Wards, to see how much had been paid on these notes. I did not do anything to ascertain how much was due on these notes."

The administrator does not assume to speak with any degree of certainty as to the exact amount received by him from this source; nor is there any intimation from the evidence that the makers of this note were not entirely responsible, or that any other reason existed for not enforcing collection of the entire amount due thereon. Where securities, like duebills or notes, are found in the pos-

session of the intestate at the time of his death, the presumption arising from such possession is that they are evidence of a valid indebtedness in favor of the deceased.    Bell v. Spotts, 50 How. Pr. 162.    An administrator, having notice that there is a debt due the estate, is bound to exercise active diligence in its collection. He is not permitted to shield himself from liability by showing that the heirs never requested collection, but, in case the debt is lost through his negligence, he becomes liable for a devastavit.    Harrington v. Keteltas, 92 N. Y. 40.    If the representative of an estate receives notes not shown to be worthless and uncollectible, and makes no effort to collect them, or by his delay in beginning suit thereon enables the debtor to protect himself by the statute of limitations, or allows the assets to remain outstanding, he is guilty of a devastavit.    7 Amer. & Eng. Enc. Law, 347.    In one case, where an executor permitted moneys due upon a bond to remain uncollected for three years without inquiring into the financial condition of the obligor, or calling upon him for payment, on the obligor becoming bankrupt it was held that the executor was personally liable.    Powell v. Evans, 5 Ves. 839.    See, also, to substantially the same effect, Attorney General v. Higham, 2 Younge & C. Ch. 634; Long's Estate, 6 Watts, 46; Schultz v. Pulver, 11 Wend. 361.    No satisfactory reason is disclosed by the evidence in this case for releasing the administrator from liability upon this note.    It is quite apparent that he did, in fact, receive at least a part of the proceeds thereof, and no legal excuse is presented for not collecting the entire amount.    The law imposed upon the administrator the duty of exercising ordinary diligence and prudence in the management of the affairs of this estate, and it is not a sufficient compliance with this requirement for the administrator to show a passive indifference, a willingness to take whatever was offered, without any active or earnest effort to collect the full amount represented by this security.

Again, the account filed contains a further credit, accompanied with the following explanation:

"The mortgage named in said inventory, and valued at $278.18, was really less than that sum by upwards of $100. A large number of payments had been made thereon, and the balance due and uncollected thereon was $175."

On his examination by the contestants, the administrator testified:

"I state in my account that I only received $175 on that mortgage. That was my recollection. I collected that myself. My recollection is that it was but $175. I did not look over any receipts to see if that was all that there was unpaid. I am not positive as to any of these payments."

The mortgagor was called as a witness by the contestants, and it appears from his testimony and from the receipts and papers produced by him that he paid to the administrator upon this mortgage the sum of $25, October 25, 1884, interest, and on the 15th of April, 1885, the balance of the principal, $262, making a total amount of money received by the administrator from this source the sum of $287.

The principal controversy, however, in this case relates to the administrator's personal claim. In the account filed the administrator sets forth his demand in the following form:

"My intestate, at the time of his death, was indebted to me in the sum of $300 for money lent by me to him in his lifetime, and which he had not repaid to me. Also for work and labor performed by me for him at his request. Amount of indebtedness, $300."

Subsequently, during the progress of the accounting, the administrator filed a formal verified statement of his claim as follows:

"Estate of David Childs, deceased, to Marvin A. Childs, Dr. To money lent and advanced to the said David Childs, in the years 1876, 1877, 1878, 1879, and 1880, over and above all sums repaid by said David Childs, (about) $400."

In determining the validity of this claim, the fact that the administrator has verified the same is of no consequence; for while an administrator is required to present his personal claim against the estate, accompanied by his affidavit verifying the same, before it can be allowed, (Terry v. Dayton, 31 Barb. 519,) such verification in no way establishes the validity of the debt. The administrator is disqualified from testifying to the facts constituting the claim, (Code, § 829,) and the only purpose of requiring the verification to the claim when presented is that it may be in form to confer jurisdiction to examine into its merits. The existence of the debt must be established by legal evidence. Underhill v. Newburger, 4 Redf. Sur. 499; Williams v. Purdy, 6 Paige, 168.

No written evidence of the validity of this claim is presented, nor is there any direct proof of the facts constituting the alleged loan. The only evidence upon which the claim is sought to be sustained is proof of certain declarations on part of the intestate. George Drachslyn testified that he had resided in the same neighborhood and been intimately acquainted with the intestate since 1861; that on one occasion the intestate said to him that he was getting old; that he thought he was going to die; that he owed Marvin $400 or $500, money he had let him have, and he wanted to pay it before he passed away; that "Marvin had helped him back and forwards," and that "Marvin had let him have things to the amount of $400 or $500." On his cross-examination this witness was interrogated as to the time of hearing this declaration by the intestate, and said that it was very soon after he first became acquainted with him,—that is, in 1861,—and that deceased told him that the occasion of Marvin letting him have the money was because he was old and feeble, and needed it to keep him alive. Harry Childs, a son of the administrator, testified that on the occasion of the funeral of George Childs, a son of intestate, who died shortly prior to the death of intestate, the intestate said to the administrator in the presence of the witness: " 'Marvin, I am owing you $400 or $500. Let it be just as it is. Everything is yours anyway. You will have all that is left.' That is all that was said at that time." The only intimation from the evidence as to the time of the alleged loans is the statement of the witness Drachslyn that the intestate first told him of it in 1861, or directly after he became acquainted with him; hence it is quite apparent, if such a

claim ever existed to any extent, the demand was a stale one, and quite likely barred by the statute of limitations. The fact that it does not appear that the administrator took any note or other written evidence of this indebtedness, or that he made any attempt to secure an adjustment of the demand during the lifetime of the intestate, or that he ever suggested to any of the parties interested in the estate that he had such a claim until required to account, are circumstances weighing heavily against the probabilities of the validity of this demand. Then, again, the reason assigned for the making of such loan was that it was urgently necessary for the support and maintenance of the intestate, yet the undisputed evidence in the case shows that during the entire period the intestate was a man of some means, entirely sufficient to provide for himself and family; that he owned certain real estate, had money invested on bond and mortgage, money on deposit with one Metcalf for safe-keeping; that on various occasions he declined to accept payment on his outstanding securities, alleging that he did not need the money, and would not know what to do with it if paid. The intestate was a man of usually good health, frugal and economical, engaged in business as a shoemaker, with sufficient patronage to keep him busy. During the same period the administrator was a man of but little means, owning no home, but occupying rented property, supporting himself and family from his labor as a shoemaker and glove cutter. The probabilities are very much against the supposition that the intestate was a borrower from necessity, or that the administrator was in a condition to loan money during that period. Again, if Drachslyn's statement is taken as true, the intestate was very desirous of paying this demand before his death. The evidence shows that there was no reason why intestate could not have paid this demand at any time if he actually owed it, for, as already suggested, he had money invested and on deposit for which he had no immediate use, and which might have been applied in satisfaction of this demand; and the very fact that intestate did not make such application is a circumstance indicative of the invalidity of the demand.

Suspicion is cast upon the accuracy of the evidence of the witness Harry Childs in regard to the declaration of intestate which he claims to have heard. The witness Reeves testifies that the administrator, in detailing this same conversation to him, said: "Rightfully the property all belongs to me. At the funeral of George, the old man called me into the room, and said, 'Now, you are all that is left, and I want you to have all that is left;'" but that the administrator made no claim that the intestate had then admitted that he was owing the administrator. One Beers was sworn as a witness for the contestants, and stated that he was intimately acquainted with the intestate; that he was accustomed to visit and talk over business matters with him; that shortly before his death the intestate, in speaking of the condition of his affairs, said that he did not owe a man a dollar in the world. It has been asserted that claims withheld during the lifetime of the alleged debtor, and sought to be enforced after his death, should be carefully scrutinized, and only admitted upon satisfactory proof. Kearney

v. McKeon, 85 N. Y. 136. It is always unsatisfactory to uphold a liability against an estate upon proof of declarations alone. The courts have had occasion heretofore, and with good reason, to criticise evidence of this character. In Law v. Merrills, 6 Wend. 268, the chancellor says:

"Evidence to establish a fact by the confessions of the party should always be scrutinized and received with great caution, as it is the most dangerous evidence that can be admitted in a court of justice, and the most liable to abuse. Although a witness is perfectly honest, it is impossible in most cases for him to give the exact words in which an admission was made, and sometimes even the transposition of the words of a party may give a meaning entirely different from that which was intended to be conveyed to the witness."

It has always been regarded as a primary rule of evidence that oral admissions of a party are considered the weakest kind of evidence, and always to be accepted with caution and scrutiny. 1 Greenl. Ev. §§ 200, 201; Stephens v. Vroman, 18 Barb. 250; Carbon Works v. Schad, 38 Hun, 71. I am unable to discover, from a careful examination of all the evidence in this case, and from a thorough consideration of the authorities bearing thereon, any substantial reason for allowing this personal claim. The evidence produced to establish it is not only of the character which the courts have designated as uncertain and unsatisfactory, but is entirely inconsistent and utterly at variance with all the probabilities springing from the circumstances surrounding the case; and the claim itself is of the kind which the courts have determined should be established by the most satisfactory kind of evidence.

The only question of fact to be determined in regard to the administrator's liability for interest is as to what, under all the circumstances of the case, was a reasonable time for the administrator to collect in and distribute the funds of the estate, or so invest the same as to produce an income. It does not appear directly at what time the administrator received the proceeds of the Ward notes, but it does appear that he received the principal sum of the Squires mortgage on the 15th day of April, 1885. It is fair to assume that the notes were paid, or should have been collected, as soon as that; and, under all the circumstances, six months from that time was sufficient for the administrator to make some proper disposition of the funds of the estate, and, as it does not appear that he did so, but quite likely used the funds for his own benefit, he should be charged with interest on the balance remaining in his hands after the expiration of that period.